Bolin, Administrator, Appellant, vs. Chicago, St. Paul, Minneapolis & Omaha Railway Company, Respondent.

*November 17 — December 7, 1900.*

*Negligence: Contributory negligence: Comparative negligence: Wilful injury: Railroads: Driving trespasser from moving train.*

| 108 | 333 |
|---|---|
| 108 | 264 |
| f108 | 601 |
| 108 | 333 |
| 109 | 389 |
| 108 | 333 |
| 110 | ¹159 |
| 110 | ²330 |
| 53 LRA | 622 |
| 108 | 333 |
| 116 | ²646 |

1. In an action to recover damages claimed to have been caused by ac-tionable negligence of the defendant, contributory negligence of the plaintiff, however slight, precludes his recovering damages, notwithstanding negligence of the defendant, however great, con-tributed thereto.
2. If a person injure another, either actually or constructively intend-ing to do so, the injury is not attributable strictly to negligence, but to that degree of misconduct called wilful misconduct in the law, which this court has classed as gross negligence, though it has no element of inadvertence, a necessary element of negligence.
3. If an injury be wilfully inflicted within the meaning of the rule last stated, contributory negligence on the part of the injured person will not preclude his recovering damages therefor; neither will the fact that he was, at the instant of receiving such injury, a wilful trespasser upon the property of the person guilty of the wilful act.

Bolin vs. Chicago, St. Paul, Minneapolis & Omaha R. Co.

4. A railway company is not obliged under all circumstances to stop its train before requiring a wilful trespasser thereon to cease his unlawful conduct.

5. If a railway train be not going at a dangerous rate of speed for a trespasser thereon to leave it, having regard to existing circumstances and the general custom of persons of his class in respect to boarding and leaving such trains while moving, and he cease the trespass by jumping from the train pursuant to the command of a trainman unaccompanied by any act of such trainman reasonably calculated to cause such trespasser to lose his self-control, the circumstances will not tend to show intent on the part of such trainman to commit a wilful injury.

6. It is not sufficient to warrant a reasonable inference of that intent necessary to a wilful injury to show that the alleged guilty party ought reasonably to have anticipated that such a result was merely within reasonable probabilities, else mere want of ordinary care would have that effect. To warrant such inference the circumstances must be such that a man of ordinary intelligence would expect such an injury to occur.

7. If a trainman command a wilful trespasser, riding on the bumpers of a freight train moving at the rate of four or five miles an hour, and whom such trainman has reasonable ground to believe is skilled in jumping on and off trains under the existing circumstances, no means reasonably calculated to cause such trespasser to lose his self-control being used to enforce the command, an intention to injure such trespasser, necessary to a wilful injury, cannot reasonably be inferred therefrom.

[Syllabus by MARSHALL, J.]

APPEAL from a judgment of the circuit court for Eau Claire county: JAMES O'NEILL, Circuit Judge. *Affirmed.*

Action to recover damages for the death of Christ Peterson, alleged to have been caused by the wrongful conduct of the servants of the defendant in charge of one of its trains, for which conduct it was claimed defendant was liable. The deceased and his brother started from a place called Foxboro to beat their way on trains to their homes near Black River Falls, Wisconsin, a distance of several hundred miles. After journeying about five days, riding sometimes on one train and sometimes on another, as they could secure an oppor-

tunity, and without paying any railroad fare, on some occasions riding by permission of the trainmen and on others secreting themselves upon the train, they arrived at the station of Chippewa Falls. From there they went to Eau Claire on a street car. On the night of December 10th, with other persons to the number of about ten, who were in the same business of beating their way upon railroad trains, they boarded an east-bound passenger train at the Eau Claire station, each of such persons secreting himself on the train as best he could, the deceased and his brother locating themselves on the front end of a mail car. At Rosedale station, some distance east of Eau Claire, they were all compelled to leave the train. From there the deceased and his brother walked on the track to Augusta, a station further east, at which place they boarded a freight car in which there were other persons who were beating their way. It was a stock car, and the men all went inside. When the train arrived at Fairchild, the car occupied as aforesaid was set out on a side track, whereupon the deceased and his brother and their associates left the car. The two Petersons, with one or more of the others mentioned, then went upon the depot platform and waited for an opportunity to again board the train when it was made up and ready to proceed east. While on the platform one of the men who accompanied the Peterson boys suggested that they should not all keep together, whereupon the Petersons went by themselves. They stepped down upon the ground upon the right-hand side of the train, and, just before or as it started to move east, they boarded it by taking hold of the grab irons that were on the ends of the cars and climbing up onto the bumpers, one securing a place on each car. When the train had proceeded a short distance and had not yet left the depot platform, the conductor walked along on the ground on the left-hand side of the train for the purpose of discovering and ridding his train of trespassers. The train was then moving about four miles an

hour. He discovered the Peterson boys located as aforesaid and commanded them in a sharp tone of voice and with some profane language, swinging his lantern between the cars at the same time, to jump off the train. They obeyed the command. The deceased went out on the grab irons first and jumped for the platform, and his brother followed. As the deceased struck the platform he slipped, or in some manner lost control of himself, and fell under the wheels of the moving car, and was so badly injured that he died a few days afterward. Some of the persons who were associated with the Peterson boys in the stock car had secreted themselves on the train before such boys were compelled to leave it, two of such persons being on the bumpers of the front end of the car forward of the Peterson boys. They observed the conductor or brakeman looking for trespassers and jumped off the train just before the Peterson boys left it. One of them testified on the trial, saying that the train was going three or four miles an hour, or four or five miles an hour, and that, after they were compelled to leave the train and as they were running along the side watching for. an opportunity to get on again, they saw the Peterson boys jump off. A short time after the accident happened the survivor of the Peterson boys made a statement of the circumstances of the injury to his brother, to be taken down in writing. Such statement was to the effect that while they were on the bumpers of the train it started; that it had gone only a few rods when they were commanded to get off the train, the man saying, " Get off boys, God damn you, hurry up and get off." There was other evidence substantially all to the effect that the speed of the train when the Peterson boys jumped off was not more than four or five miles an hour, or such that a person could walk and keep up with it. There was undisputed evidence that the class of men who beat their way on railroad trains customarily jump on and off trains when they are moving at a greater speed

than four miles an hour; that when a train is going at such greater speed it is common for such class of men to get upon the bumpers of the cars, catch onto the truss rods, crawl upon the truck beams, and secrete themselves on the trains in other ways; that when such men are discovered they will, unless permitted to ride, customarily drop or jump off the train.

The jury rendered a special verdict, substantially as follows:

(1) The conductor ordered the deceased and his brother to leave the train, striking at them with the lantern which he carried in his hand.

(2) The conductor ordered the deceased and his brother from the train, accompanying the order with an oath.

(3) Because of the position the conductor was in when he ordered the deceased off the cars, the manner in which he was dressed, the fact that he had a lantern in his hands, the distance from him to the deceased, the words used by him, and all the circumstances, the deceased jumped from the car because of a reasonable apprehension of immediate physical force being used to eject him, the violently threatened force being sufficient to impress a reasonable person with the belief that there was imminent danger of its being employed.

(4) The circumstances existing at the time the deceased was compelled to leave the train were such as to imperil his personal safety.

(5) The train was moving at the rate of three or four miles an hour.

(6) The conductor exercised his authority of removing passengers from the train in an unreasonable, imprudent, and improper manner, and without proper regard to the safety of the deceased.

(7) The act of the conductor was the proximate cause of the injury to the deceased.

(8) The conductor, was guilty of reckless or wanton conduct in compelling the deceased to leave the car under the circumstances.

(9) Such reckless or wanton conduct was the proximate cause of the injury.

(10) The conductor, under the circumstances, ought reasonably to have anticipated that his conduct would cause an injury to the Peterson boy.

(11) The Peterson boy was not guilty of any want of ordinary care which contributed directly to the accident.

(12) We assess the damages recoverable for the benefit of the estate at $5,000.

Upon motion of defendant the verdict was amended by striking out the affirmative answer to the eighth question, substituting a negative answer therefor, and upon the verdict so amended the defendant moved the court for judgment. The motion was granted and judgment was entered accordingly, from which plaintiff appealed.

For the appellant there was a brief by *W. H. Frawley*, attorney, and *W. F. Bailey*, of counsel, and oral argument by *Mr. Bailey*.

For the respondent there was a brief by *H. H. Hayden* and *Pierce Butler*, attorneys, and *Thomas Wilson*, of counsel, and oral argument by *Mr. Wilson*.

Marshall, J. The reasons urged by counsel for appellant for a reversal of the judgment appealed from may properly be reduced to the following: Plaintiff's cause of action depended upon whether the defendant's conductor was guilty of gross negligence as found by the jury in answer to the eighth question. With that fact established, the right to recover was complete regardless of whether plaintiff was or was not guilty of contributory negligence. Evidence was produced permitting of a reasonable inference in accordance with the answer to such eighth question, so that it was

error on the part of the trial court to treat such answer as erroneous and give judgment for defendant upon the ground that there was no evidence that brought the fact so found within reasonable probabilities.

The idea plainly contended for in the first proposition mentioned is that if a person be injured by the concurrence of two proximate causes, one want of ordinary care on the part of such person and one gross negligence on the part of another, legal damages result. To support that theory the learned counsel has drawn liberally from the adjudications of other courts, many of which have either followed fully or in part the doctrine of comparative negligence, which finds its most significant source in *Davies v. Mann*, 10 Mees. & W. 546, and has referred to adjudications of this court, which are made to appear consistent with such foreign adjudications. The doctrine referred to, so far as it permits a recovery of damages as the result of a negligent act to turn on a comparison of the negligence of the plaintiff with the negligence of the defendant, however great the latter may be, within the boundaries of negligence strictly so called, and however slight the former may be if it only pass the boundaries of want of ordinary care, is not now and never has been a part of the law of this state, though it is true there are many expressions here and there, in opinions in cases decided, where the term "negligence" has been used as descriptive of wrongful conduct that was beyond the scope of the term "negligence" as it is ordinarily understood, which have led to some misunderstanding as to what the law really is. Some of such cases have, by the learned counsel for appellant, been brought significantly to our attention.

It seems necessary at this time to take a general view of the decisions of this court in respect to counsel's contention that gross negligence permits a recovery of damages resulting therefrom notwithstanding contributory negligence of

the sufferer.   By doing so we shall, we venture to say, make
it clearly appear that any degree of negligence, strictly so
called,— wrongful conduct which springs from inadvertence
to any extent, whether of an active or passive character,—
does not preclude the successful interposition of contributory
negligence as a defense; while wilful misconduct, so con-
curring, does have that effect, such wilful wrong being what
is sometimes referred to as wilful, malicious, or wanton,
evincing intention to do an injury to another,— wrongful
conduct which renders the guilty party properly liable to a
claim for punitory damages and which does not fall within
the scope of the term "negligence," though the term "gross
negligence" has been so extended by this court and some
others as to include it.

In *Stucke v. M. & M. R. Co.* 9 Wis. 202, the earliest case
in this court where the subject under discussion was treated
to such an extent as to influence the subsequent judicial his-
tory of the state, the rule above indicated was not stated suffi-
ciently strongly to fully satisfy what has been said, though
the facts of the case fully warranted it.   A locomotive en-
gineer caused his engine to collide with a cow on the railway
track and kill her under such circumstances as to clearly
indicate an intention to produce that result.   It was not an
act of negligence, but a wilful act, as that term is ordinarily
used in the law, indicating intention.   There was no rea-
sonable ground to say that the engineer's act was character-
ized by any element of inadvertence.   The court, in discuss-
ing his conduct, called it gross negligence, but demonstrated
what was meant thereby by quoting with approval Lord
DENMAN, C. J., in *Lynch v. Nurdin*, 1 Adol. & E. (N. S.), 29
(41 Eng. C. L. 422), to the effect that the boundary line be-
tween wilful mischief and gross negligence is so hard to
trace that it cannot be discovered with judicial certainty.
"The law blends one into the other and considers that gross
negligence indicates, to some extent, malice."   That was

followed in another paragraph by a general observation as to the law which did not accurately measure the facts of the case, nor come up to the standard of wrongful conduct that Lord DENMAN placed within the scope of the term "gross negligence" which is necessary to preclude the defense of contributory negligence. Such general observation, if it did not clearly enter the domain of comparative negligence, came dangerously near its boundaries. We refer to the following: "Where the facts show such degree of rashness or maliciousness on the part of the servants of the company as to evince a total want of care for the safety of the cattle or willingness to destroy them [there is no trouble up to that point], though such destruction may not have been intentional [there is the difficulty, if the word "intentional" be understood in any other sense than premeditated design], we think it is no departure from justice or principle to hold the company responsible unless it appears that the plaintiff was equally negligent." However, that the court did not decide that negligence, strictly so called,— even gross negligence, except as that term was extended to include wrongful acts not characterized by any degree of mere inadvertence,— precludes the defense of contributory negligence, was demonstrated by many decisions thereafter rendered, in some of which the learned chief justice who wrote the opinion participated and pronounced the judgment of the court, and in none of which was it found necessary to even criticise the *Stucke Case*.

In *Potter v. C. & N. W. R. Co.* 21 Wis. 372, an instruction given to the jury by the trial court, to the effect that if the plaintiff was guilty of slight want of ordinary care (the word "negligence" was used, but in subsequent cases corrected), contributing to his injury, he can nevertheless recover if the defendant was guilty of gross negligence which was also a contributing cause, was condemned, the court announcing the true rule of law to be that negligence (mean-

ing want of ordinary care), however slight, contributing to the injury, prevents a recovery therefor. The language of Judge DOWNER in the *Potter Case* was quoted with approval in *Cunningham v. Lyness,* 22 Wis. 245, with the remark that, 'Substantially the same principle has been decided by the court in many cases, that a party cannot recover for an injury of which his own negligence was in whole or in part the proximate cause.' To that all previous cases on the subject were cited, commencing with the *Stucke Case.*

In *Ward v. M. & St. P. R. Co.* 29 Wis. 144, opinion written by DIXON, C. J., the *Potter Case* was again referred to with approval, this language being used: "The law does not attempt to measure how little or how greatly the plaintiff may have fallen short of using ordinary care, but any failure in this respect or slight want of such care, contributing directly to the injury, will forbid a recovery."

· *Potter v. C. & N. W. R. Co.* was again referred to in *McCandless v. C. & N. W. R. Co.* 45 Wis. 365, accompanied by language unmistakably indicating a judicial view that wrongful conduct exceeding mere negligence in any of its degrees as ordinarily understood, that is, as characterized by inadvertence, is essential to prevent the defense of contributory negligence being effective. The position of the court as thus maintained can be most quickly and definitely stated by quoting from the opinion written by Mr. Justice TAYLOR, as follows: "This court has held that slight negligence or slight want of ordinary care on the part of the plaintiff, which contributed directly to the injury complained of, would defeat an action even when the negligence of the defendant was gross. *Potter v. C. & N. W. R. Co.* 21 Wis. 372; *Cunningham v. Lyness,* 22 Wis. 245. . . . There was no evidence to go to the jury upon the question of whether the injury was produced by the wilful or malicious act of the servants of the defendant, and we think that nothing short of that would have justified a verdict in favor of the plaintiff."

The doctrine firmly established by the foregoing was so emphasized in *Randall v. N. W. Tel. Co.* 54 Wis. 140, that no room was left to misunderstand the purport of our judicial history up to that time or opportunity for departing therefrom in the future, consistent with a familiarity with such history, without evincing an intention to adopt, to some degree at least, the doctrine of comparative negligence. In discussing instructions given by the trial court which followed the lines of the most extreme notions of comparative negligence, Mr. Justice TAYLOR, speaking for the court, said: "Such a rule of weighing comparative negligence of the parties has never been adopted in this state. The rule in this state is that slight want of ordinary care which contributes to the injury will defeat the plaintiff's action, no matter how gross the negligence on the part of the defendant, unless such negligence be so gross that the court and jury may infer that the act of the defendant was malicious," citing all the cases heretofore referred to, commencing with *Potter v. C. & N. W. R. Co.* It is significant that some years later Mr. Justice TAYLOR, in *Schilling v. C., M. & St. P. R. Co.* 71 Wis. 255, 261, probably without intending to be inconsistent with the established doctrine of the court as by himself distinctly stated in the two opinions to which we have referred, dissented from the decision there rendered, upon the theory, as we read his opinion, of comparative negligence. He assumed that mere negligence of the defendant of a high degree — conduct short of such as imports an intention to injure — will preclude the successful interposition of the defense of contributory negligence. He referred to the conduct of the defendant as gross negligence sometimes, and as negligence at others, but there was no evidence in the case, as the court, we must assume, decided, indicating a wilful injury even to the extent of a conscious disregard of whether the injury which in fact took place would be produced by his conduct.

Bolin vs. Chicago, St. Paul, Minneapolis & Omaha R. Co.

In *Schoenfeld v. Milwaukee City R. Co.* 74 Wis. 433, it is said that, "The law has grown to be elementary that any negligence of the plaintiff, however slight, that contributed to the injury complained of, precludes his recovery." That was followed by language for the first time, so far as we have discovered in any opinion of the court, giving color to the idea that gross negligence of the defendant, as the term is ordinarily understood, that is, having regard to the essential element of inadvertence, though of a high degree, is actionable regardless of his victim's contributory negligence. This is the language: "The learned counsel of the appellant contends that inasmuch as the defendant was guilty of gross negligence that caused the injury, the principle does not obtain. But neither the facts in evidence nor the finding of the jury made the defendant guilty of gross negligence. It was mere negligence and not wilful or gross that the jury found against the defendant. The authorities cited to this point are therefore inapplicable." When rightly understood it is clear that the word "gross" as there used referred to the wilful misconduct which was said in previous decisions to indicate intent. Mr. Justice ORTON used the terms "wilful" and "gross" in close connection, the latter being really used as explanatory of the former. Of that there can be no doubt, since *Potter v. C. & N. W. R. Co.* 21 Wis. 372, and the other cases to which we have referred, were cited with approval, where it was distinctly stated that gross negligence, using the term as indicating inadvertence, does not permit a recovery for an injury caused proximately thereby in the face of contributory negligence of the injured person contributing thereto.

*Valin v. M. & N. R. Co.* 82 Wis. 1, is recognized as out of harmony with previous decisions of this court. It was there said that negligence less than gross will permit a recovery even though the injured party be guilty of contributory negligence. The term "negligence," by itself, was

evidently used as extending to the boundaries of inadvert-
ence, and the term "gross," in connection with the term
"negligence," as indicating wrongful conduct of a still
higher degree. The departure which the opinion indicates
from the law as previously declared was corrected in *Lock-
wood v. Belle City St. R. Co.* 92 Wis. 97. Though it was
there said, in effect, that contributory negligence of the
plaintiff will not militate against his right to recover as
against gross negligence of the defendant, it was plainly
indicated that the latter term was used as descriptive of
conduct evincing wilfulness, as the word is used in the law,
as synonymous with intent, either premeditated or its equiv-
alent, as regards legal liability for damages. The present
chief justice there said, in effect, that inadvertence, in some
degree, is the distinguishing characteristic of negligence,
while misconduct of a more reprehensible character, char-
acterized by rashness, wantonness, and recklessness of a per-
son as regards the personal safety of another, has been
designated by this court as gross negligence. The purpose
of the opinion was to correct *Valin v. M. & N. R. Co.* and to
pronounce the law as in *Potter v. C. & N. W. R. Co.* 21 Wis.
372, to which we have referred, such case being cited as the
groundwork of the decision. The term "rashness, wanton-
ness, and recklessness" was used as synonymous with "wilful
or malicious" in *Randall v. N. W. Tel. Co.* 54 Wis. 140, and
in *McCandless v. C. & N. W. R. Co.* 45 Wis. 366, "wilfully,
maliciously, or intentionally" in *Lynch v. N. P. R. Co.* 84
Wis. 348, "wilful or gross" in *Schoenfeld v. Milwaukee City
R. Co.* 74 Wis. 433, and similar expressions. It is perhaps un-
fortunate that so many different expressions have been in-
dulged in to express the idea of wilful as regards the result
caused,— conduct indicating a sufficient degree of intent, at
least, to be inconsistent with inadvertence, the distinguishing
characteristic of negligence, strictly so called. The diffi-
culty, if there be one, has grown out of extending the term

"negligence" in connection with the term "gross" so as to cover wrongful conduct distinct from negligence, strictly so called, by including in it an element of advertence instead of inadvertence. Wilful, in legal parlance, means intentional, though not necessarily that express intent characterized by premeditated design.

That the language in *Lockwood v. Belle City St. R. Co.* 92 Wis. 97, was intended as indicated, is fairly demonstrated by the following, used by the same writer in *Lynch v. N.P.R. Co.*, *supra*, in part heretofore referred to: "There is no sufficient evidence in the record to sustain the finding that the engineer was guilty of gross negligence. In fact the jury expressly exculpated him from wilfully, maliciously, or intentionally injuring either of the horses." To the same effect is *Schug v. C., M. & St. P. R. Co.* 102 Wis. 515, where it was said that gross negligence that cannot be defended against by contributory negligence is that rashness or wantonness which evinces a total disregard for the safety of persons or property and is but little less than intentional wrong. Also, *White v. C. & N. W. R. Co.* 102 Wis. 489, 496, where it was said that in all cases where the recovery is based on negligence the plaintiff's conduct must be free from contributory negligence however slight, if the defendant's negligence is short of that which may be justly called wilful. See, also, *Duame v. C. & N. W. R. Co.* 72 Wis. 523; *Pennsylvania Co. v. Sinclair*, 62 Ind. 301.

There are other cases that might be referred to bearing on the subject discussed, but it is believed there are none that would furnish additional light or vary the conclusion to which those we have mentioned unerringly point. There has been substantial harmony in the adjudications of this court from the first, leaving out *Valin v. M. & N. R. Co.* 82 Wis. 1, and *Little v. Superior R. T. R. Co.* 88 Wis. 402. In the latter case there was a plain departure from the position of the court up to the time of the *Valin Case*, on the doctrine

of comparative negligence. That occurred by following such case. With the exceptions noted such doctrine has not found any place in our jurisprudence, though in some jurisdictions it has become firmly intrenched; and in one, after becoming so intrenched, the mischief of it was avoided by a legislative return to sound principles. The first departure here was corrected in *Lockwood v. Belle City St. R. Co.*, as we have seen. The second departure was corrected in *Johnson v. Superior R. T. R. Co.* 91 Wis. 233.

Want of ordinary care upon the part of an injured person, however slight, precludes recovering compensation for his injury from another who contributed thereto by his *negligence*, however great, but not if so contributed to by wilful misconduct evincing intention to produce it, so far, at least, as to indicate conscious disregard of whether the injury occur or not, with knowledge that such a result will probably take place, which this court has brought under the head of the highest degree of negligence, calling it gross negligence. Circumstances making a claim for punitory damages against the immediate wrongdoer proper are really necessary in order to render contributory negligence of the injured party immaterial.

In the light of the foregoing, was contributory negligence material in this case? Counsel for both sides concede that such was not the situation unless the misconduct of the trainman was of that degree necessary to render the fact that the deceased was a wilful trespasser immaterial, that is, unless his conduct was such as to evince an intention to injure the deceased, or such an utter disregard of the consequences of his act as to indicate that willingness to injure him which is equivalent, in respect to legal damages, to intent to produce the result. That is unquestionably the law as it has been stated by this court, and most recently in *Schug v. C., M. & St. P. R. Co.* 102 Wis. 515. It is so laid down by standard text writers, as, for example: 'If a railroad com-

pany wilfully injure a trespasser, it will be liable even though he may be guilty of contributory negligence. In some jurisdictions the term "gross negligence" is used.' Elliott, Railroads, § 1254. "A railroad owes trespassers no contract duty. Indeed, as already stated, the general rule is that it owes them no duty except not to wilfully injure them; and this applies to those who are attempting to steal a ride or otherwise trespass upon the company's cars." Id. § 1255. A trespasser on a railroad train may recover for a wilful injury inflicted upon him by the trainmen in the performance of their master's duty. Shearm. & Redf. Negligence (5th ed.), § 64.

So it follows that whether the defense of contributory negligence and the finding of the jury in that regard were material, as well as the right of plaintiff to recover independent of it, turns on whether we can say that the trial court erred in holding that, looking at the evidence in the most favorable light for the plaintiff that reason will permit, and giving to him the benefit of the most favorable inferences it will reasonably bear, it does not indicate that the defendant's conductor was guilty of wilfully injuring the deceased. It seems that such question must be answered in the negative. There is no reasonable ground for saying that the conductor knew or ought to have known that a personal injury to the deceased would probably occur by his obeying the command to leave his position on the bumper of the car and cease his unlawful act of trespassing upon the defendant's property. The conductor supposed, and had a right to suppose, under the circumstances, that the deceased was a man of experience in jumping on and off trains when they were moving at a speed of more than four miles an hour; that he belonged to a class that were accustomed to such conduct and without putting themselves in any serious danger of receiving personal injuries. The evidence is all one way to that effect. The train was going at no greater speed than a man can walk. It was still at

the depot platform which the deceased left but a moment before he was injured to secure his place between the cars. He had the same means of safely leaving the train that he had in boarding it, save that it had in the meantime commenced to move slowly. Others of his class and with whom he had been associated were at that very time seeking to evade the vigilance of the trainmen and to board the train by seeking a position similar to that occupied by the deceased. He was not physically coerced. His ability, mental and physical, to care for himself was not reasonably impaired by anything which the conductor did. The circumstances were very unlike those in *Stone v. C., St. P., M. & O. R. Co.* 88 Wis. 98. That did not turn on the mere fact that the train was in motion, but the fact that it was going at a dangerous rate of speed, some eight miles an hour; and the further fact that the injured person was not a professional trespasser upon railway trains, but was one who appears to have boarded the train to ride as a passenger, supposing that he would be permitted to do so, and in that view took his place in the caboose. Nor is the case like *Carter v. L., N. A. & C. R. Co.* 98 Ind. 552, where a trespasser was pushed off the front end of a switch engine while it was in rapid motion, and in such a way that he was unable to exercise judgment in making the movement, and was thereby caught under the wheels of the engine and seriously injured. Neither is it at all like *Kansas City, Ft. S. & G. R. Co. v. Kelly,* 36 Kan. 655, where the case turned on the dangerous rate of speed the train was moving, some eight miles an hour; that the injured person was a boy; and that he was compelled to jump from the ladder of a box car in the face of apparent imminent danger of being thrown from his position. It is just as much unlike *Ansteth v. Buffalo R. Co.* 145 N. Y. 210, where the injured person was a lad ten years of age and was so terrified that he dropped from a car upon which he was riding while in momentary

loss of self-control. Such cases, and others upon which reliance is placed, are quite distinguishable, and have been ·distinguished in adjudications by other courts, from cases like this, two elements of distinction being referred to as ·of controlling significance: the speed of the train, and the inability of the injured party, by reason of the wrongful ·conduct of another, to use his judgment and control his movements. *Mugford v. B. & M. R. Co.* 173 Mass. 10; *Planz v. B. & A. R. Co.* 157 Mass. 377. Those cases are in harmony with the cases upon which counsel for appellant mainly rely, so far as the latter do not enter the domain of comparative negligence. They hold, and rightly, ·in our judgment, that there is no actionable wrong, if wrong ·at all, in insisting upon a person who is a wilful trespasser upon a railway train ceasing his unlawful conduct instantly, ·if the train be not going at such a rate of speed as to render that unreasonably dangerous under the circumstances ·and the trespasser be not ill-used so as to cause him to momentarily lose his judgment or self-control. We perceive no ·difficulty in the rule of the Massachusetts cases when rightly ·understood. The Massachusetts court holds as strongly as ·any other that a trainman cannot, in the pursuit of his master's business, wilfully injure a trespasser on his train without the master thereby becoming liable for the resulting ·damages, but that he may properly command such a wrongdoer to end the trespass at any time, not accompanying ·such command by conduct indicating such imminent danger of its being so enforced as to produce involuntary compliance therewith. If the command be obeyed and an injury to the trespasser result, the previous command will not ·evidence a wilful injury even if the speed of the train be such that to physically compel the trespasser to cease his ·unlawful conduct would render a resulting injury wilful and actionable. The doctrine seems sound, and it applies ·to this case so far as it fits the facts. The respondent's con-

ductor commanded the deceased to leave the train. . He did not touch the deceased nor threaten violence to him nor do anything reasonably indicating that he was about to physically compel deceased to cease the trespass and to accept imminent danger of receiving a personal injury in doing so.

It must be admitted that *Johnson v. C., St. P., M. & O. R. Co.* 94 Fed. Rep. 473, goes much further than the doctrine referred to. We do not deem it necessary to even discuss in this case the extreme views which United States District Judge SHIRAS there expressed. The doctrine that human life cannot wilfully be seriously imperiled to prevent or end a mere trespass upon property must not be invaded by courts even to remedy the menace and almost intolerable mischief caused by the conduct of those who habitually unlawfully contend with railroad trainmen to secure transportation upon their trains. But the inviolability of personal security against wilful injuries can be adequately secured without going to such an unreasonable length as to hold that a railway company cannot rid its trains of the presence of wilful trespassers without first stopping such trains. That would, in effect, deny such company the right to protect its trains at all against such lawlessness, as in that case such an army of men would be required to effect that result as to render the conduct of railway business impracticable.

Our statute (sec. 1818, Stats. 1898) requiring a train upon which a passenger is riding after having refused to pay his fare, to be stopped at a railway station or near a dwelling house before putting him off does not apply to such a case as this.

This opinion would need to be extended to a great length in order to review even a major part of the numerous cases cited by the learned counsel for appellant. While we cannot agree with his conclusions, we are much indebted to his industry and ability in reaching a right one.

A railway company may lawfully require a wilful tres-

passer upon one of its moving trains to immediately cease his unlawful conduct, by such means as not to indicate a willingness to deprive him of his self-control in leaving the train, the speed of such train not being so great that a personal injury to him should be expected to occur, giving due consideration to the duty of the trespasser to cease his lawlessness by all reasonable means in his power and reasonable expectation that he will use such means in attempting to do it. It is not sufficient to indicate an intentional injury that the party causing it had reasonable ground to expect that such a result was within reasonable probabilities, otherwise a violation of the duty to exercise ordinary care would, of itself, be sufficient to indicate such injury. The danger of inflicting a personal injury upon a person by the conduct of another must be such as to reasonably permit of a belief that such other either contemplated producing it, or, being conscious of the danger that it would occur, imposed that danger upon such person in utter disregard of the consequences, to warrant saying, reasonably, that the circumstances indicate willingness to perpetrate such injury. *Cleveland, C., C. & St. L. R. Co. v. Miller*, 149 Ind. 490.

*By the Court.*— The judgment of the circuit court is affirmed.


A motion by the appellant for a rehearing was, on February 1, 1901, held to have been waived by failure to serve and submit the arguments within the time required by Rule XX of this court.